# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

SEPTEMBER 1997 SESSION



**FILED**

**December 10, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9611-CC-00482 |
| | ) | |
| vs. | ) | Coffee County |
| | ) | |
| **BILL TEAL,** | ) | Hon. Gerald L. Ewell, Sr., Judge |
| | ) | |
| Appellant. | ) | (Burglary, Theft Over $1,000) |
| | ) | |

FOR THE APPELLANT:

GREGORY S. O'NEAL (Trial)
Attorney at Law
P.O. Box 555
Winchester, TN 37398

GREGORY D. SMITH (Appeal)
Attorney at Law
One Public Square, Ste. 321
Clarksville, TN 37040

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

C. MICHAEL LAYNE
District Attorney General

STEPHEN WEITZMAN
Assistant District Attorney General
P.O. Box 147
Manchester, TN 37355

OPINION FILED: _____

**AFFIRMED**

CURWOOD WITT
JUDGE

## OPINION

The defendant, Bill Teal, stands convicted of aggravated burglary and theft over $1,000, following trial by a jury of his peers in the Coffee County Circuit Court.[1] The court sentenced Teal to serve ten years for aggravated burglary and eight years for theft. The sentences were imposed concurrently to each other but consecutively to other sentences the defendant is serving, the defendant having been found in other proceedings to have violated parole on other offenses. In this direct appeal, the defendant challenges the sufficiency of the convicting evidence and the court's imposition of maximum sentences and fines upon him. Following a review of the record and briefs and having heard arguments in the matter, we affirm the judgment of the trial court.

During the daytime hours of October 3, 1994, the home of Nelson Johnson was burglarized. The burglary was discovered by Dr. Johnson's daughter, who returned to the house in the afternoon hours. Dr. Johnson returned home shortly after his daughter and alerted the Coffee County Sheriff's Department of the intrusion. The Johnsons discovered several items missing, including a wooden hope chest with a padded cloth top and which contained family mementos, an Apple computer and peripherals, three videocassette recorders, a television and jewelry. At trial, Dr. Johnson estimated the value of the stolen property at $4,800. In addition, he testified the door and frame through which the burglar or burglars gained entrance was damaged and cost $600 to $650 to replace. Doctor Johnson further testified the hope chest which was taken was full of photographs, dolls and other family mementos and was very heavy. He had required the assistance of his son to move the chest from one room to another.

---

[1] This was the defendant's second trial, the first having ended in a mistrial.

On the afternoon of the burglary, Sgt. Rodney Banks of the Coffee County Sheriff's Department observed the defendant driving recklessly and stopped him. He intended to give Teal a citation, but Sgt. Banks discovered he did not have his citation book with him so he released Teal with a warning. Sergeant Banks testified this took place about 3:05 p.m. While he was talking with the defendant, Sgt. Banks noticed a cloth top hope chest, an Apple computer and peripherals, coaxial cable, and a videocassette recorder in the back of the gray S-10 Chevrolet pickup truck the defendant was driving. According to Sgt. Banks, the items were not placed into the truck in a manner as he would move them if they were his property. He also noticed Shawn Holdaway[2] and Karen Alter sitting in the cab of the truck. Sergeant Banks observed Teal to act nervously, and he recounted that Teal told him they were moving things for a friend and were in a hurry. Sergeant Banks recalled the truck may have had a red stripe on the side.

Investigator Tracy Alexander responded to the Johnson home and took a report of the burglary. He was unable to locate any fingerprints. Within a few hours, he had dinner with Sgt. Banks, and they discussed the Johnson burglary. During the conversation, Alexander commented that it was unusual for someone to steal a hope chest, and Banks told him about stopping the defendant earlier in the day and seeing a hope chest in the back of his truck. The two then returned to the Sheriff's office, called Dr. Johnson, and obtained a detailed description of the stolen hope chest, which matched the one Sgt. Banks saw in the defendant's truck.

Cindy Alter testified Teal and Holdaway came by her house trailer

---

[2]Holdaway's first name is spelled "Sean" in the transcript as well as in Exhibit 9, the transcript of his guilty plea. It is spelled "Shawn" in documents in the technical record, which indicate he was a co-defendant of Teal prior to his guilty pleas. Not having the benefit of the indictment relating to Holdaway, we have elected to use the latter spelling of his name, as it appears in the Motion to Consolidate and the Order Granting State's Motion to Consolidate.

about 2:30 or 3:00 p.m. on October 3, 1994 in a small gray truck. They invited her to accompany them to McMinnville, and she agreed to go along. While they were on their way, Teal drove "sort of fast" and they were stopped by Sgt. Banks. Alter saw Teal take a watch off and throw it behind the seat before going to meet Banks behind the truck. After Banks warned Teal about his driving, Teal and Holdaway were nervous and confessed to Alter that they had taken the watch and the property in the back of the truck from the home of the high school principal, Dr. Johnson. Alter recalled seeing a hope chest with a lifting top, a computer monitor and some wires in the back of the truck. She identified the hope chest and computer she saw as being identical to like items in photographs taken in the victim's home. Alter further testified she had initially given an unsworn statement that was inconsistent with a later statement and her trial testimony. She further admitted she had originally been charged as a co-defendant with Teal and Holdaway, but those charges had been dropped. Further, she was on probation at the time of the offenses, although she is no longer on probation. She denied her probationary term had been shortened as a result of her cooperation in this case. Finally, she admitted she had been convicted of DUI.

Willie Pittman, an elderly neighbor of the Johnsons, testified he saw a gray Chevrolet pickup truck without stripes at Dr. Johnson's house between 1:30 and 2:00 p.m. on the date of the burglary. He saw two young, white men in the truck. One was driving and the other was sitting in the bed of the truck holding an object. Mr. Pittman thought the two must have been students from the high school who had been sent by Dr. Johnson to retrieve items from his home.

William A. Vaughn, Dr. Johnson's neighbor and father-in-law, saw a small, gray pickup truck pass his house sometime after 1:00 p.m. and again 10 to 15 minutes later. He saw two young white men inside the truck. He identified Teal

4

as looking like one of the men in the truck, though he admitted he was not certain.

Shawn Holdaway, a prisoner from the Department of Correction, testified he is currently serving three incarcerative sentences, two of which arose from the burglary of the Johnson home. He entered a guilty plea to the two crimes related to the burglary so he could get a "red flag" taken off the computer, which he said would allow him to be paroled. He testified he had, in fact, recently been given a parole date approximately two months after this trial. Holdaway was hostile with the prosecutor, initially asserting his Fifth Amendment privilege when asked who committed the burglary of the Johnson home and later denying many of the admissions he made at the plea hearing, even when the assistant district attorney general provided him with a copy of the transcript of that hearing.[3] Further, he said he could not recall making several of the admissions. He said Teal was not guilty of the burglary or theft. Although his evasiveness was at times inconsistent, he apparently attempted to convey that he committed the burglary either by himself or with someone other than Teal whose identity he could not recall. When asked whether he would "snitch" on his buddy, he replied, "I would snitch on a person in a heartbeat if it got me ahead, if it got me out of the system. I play dirty pool." Holdaway admitted he and Teal had been at Alter's trailer for an hour and a half to two hours on the afternoon of October 3. Holdaway attacked Alter's credibility, saying she had been "up all night with her girlfriend" and was "high, drunk" when he and Teal arrived. He claimed he drank "a few beers" with her that afternoon before they left her trailer. Further, he testified he had a short wooden dresser that looked

_____

[3]The transcript of Holdaway's plea hearing, which was entered into evidence, indicates the hope chest and a few of the items in the back of Teal's truck were stolen from the Johnson home. Holdaway denied there was any coaxial cable, computer, television or videocassette recorder belonging to the Johnsons in the back of the truck when they were stopped by Sgt. Banks, however. He testified at the plea hearing he borrowed Teal's truck while Teal was visiting with his parole officer and committed the crimes by himself. He admitted, however, that Teal was aware the property was stolen.

like a hope chest, a duffel bag, and unidentified "other items" in the back of Teal's truck that afternoon. He denied that he or Teal had admitted to Alter that they had taken anything from the Johnson home.

The defendant presented the testimony of William Teal, the defendant's uncle. Mr. Teal testified he had received word from "Rodney," presumably a reference to Sgt. Banks, that on Oct. 3 his nephew had been stopped driving a gray S-10 Chevrolet pickup truck registered to Mr. William Teal. Mr. Teal said this was impossible because his truck did not smell of smoke, as it would if Bill Teal, Holdaway and Alter had been riding in it, and further, some papers he had in the cab were not disturbed when he next drove the truck. Further, he testified his truck has a six inch red stripe and says "Sport" on it. He admitted Bill Teal also has a gray pickup truck, though Bill Teal's truck is a darker color gray and, Mr. Teal thought, did not have red detailing. Mr. Teal believed the investigating officers suspected him of the crimes at first, though he was never asked if he had seen any of the property.

Charlotte Teal, the defendant's mother, testified she bought her son an Apple computer 12 or 13 years ago and paid $300 to $400 for it. She paid cash and did not think she retained a receipt. Additionally, she recalled that her son brought home a hope chest a few months before the burglary of the Johnson home. Her son bought this hope chest in Knoxville, where he was working at the time. It had drawers that pulled out, although it had a flowered top which did not lift up. The drawers had round knobs, rather than handles on them. Mrs. Teal admitted she did not know where either the computer or the hope chest was on the day of trial.

The defendant's father, Winfred Teal, testified he was home on October 3. He said Holdaway spent the previous night in the Teal home. That

**6**

morning, Bill Teal left the home about 10:30 to go to an appointment in Tullahoma. He returned about 12:00. Holdaway remained at the Teal house while Bill Teal was gone. Bill Teal and Holdaway decided to go to McMinnville that afternoon, and Winfred Teal helped Bill load a four-drawer chest and Apple computer into Bill's truck. According to Winfred Teal, the computer had been a gift Bill received from his mother when he was 10 or 11 years old. Winfred Teal did not know how much money his wife had paid for the computer. The chest, which Winfred Teal testified had drop-down pulls rather than round knobs, had been purchased by Bill Teal while he was working in Knoxville and had been in the Teal home for two to three months. Winfred Teal assumed his son was taking these items to his girlfriend's home in McMinnville. Bill Teal and Holdaway left the Teal home around 2:00 or 2:15 p.m. Finally, Winfred Teal said he had no photographs of Bill Teal receiving the computer at Christmas, and he did not know where the computer and hope chest were on the day of trial.

With this evidence in hand, the jury found the defendant guilty of aggravated burglary and theft of property valued at over $1,000.

At the sentencing hearing, the defendant's parole officer, Deborah Riddle, testified for the state. She confirmed that the defendant met with her between 11:00 and 11:30 a.m. on the day of the crimes. He was under her supervision for three Marion County convictions for aggravated robbery. Prior to trial, Ms. Riddle filed a violation report on the defendant because he had been terminated from his job. She had previously warned him not to get fired again after he had been fired from a previous job. She confirmed the firing by speaking with Vickie Gilley of Gilley Construction Company. Further, she reported, he had tested positive for marijuana on two occasions after he was charged with the instant

7

offenses. The defendant reported being arrested for burglary and told her he had receipts for the items which were found in the back of his truck.

Laura Prosser, who prepared the presentence report on the defendant, testified Teal had a juvenile adjudication for grand larceny, in addition to convictions for public intoxication and "indictments" for three counts of aggravated robbery, all with different dates and victims.[4] She further testified that the defendant had been fired from two jobs and worked for his father for a time.

The presentence report filed by the state also reflects that the defendant quit school in the tenth grade but obtained his G.E.D. certificate while incarcerated in the Department of Correction. He received substance abuse treatment in late 1995, a few months prior to the trial and the sentencing hearing. The "family information" section of the report indicated several adult family members living in the community. A victim impact statement attached to the presentence report reflected that several family mementos which could not be replaced were taken from Dr. Johnson, and he had been deprived of the opportunity to hand these heirlooms down to his children. In addition to the family items which had no monetary value, Dr. Johnson had not received reimbursement for $240 of the loss from his insurance company. Further, the Johnson home had been vandalized during the burglary.

The defendant presented the testimony of his wife, Mary Teal, at the sentencing hearing. She is a student at Motlow State Community College and would like to have the defendant home with her and her two children of a previous marriage, who consider the defendant to be their father. The defendant has lived

---

[4]The presentence report reflects that there are actually three convictions of aggravated robbery, two from Marion County and one from Rutherford County.

up to his family obligations, though he would be better able to do so outside of prison where he could work to support his family. Mrs. Teal would encourage him to receive alcohol or other treatment, as would his parents. She related that her husband had completed an anger control class in prison and was currently taking drug and alcohol classes.

Vickie Gilley, the manager and owner of Gilley Construction Company, testified the defendant had worked for her on several occasions. She did not have any problems with his work and did not recall having fired him. She admitted someone else, possibly the defendant's brother, may have fired the defendant, although she could not remember.

The trial court found the defendant a Range II offender. After considering the enhancement and mitigating factors, it sentenced the defendant to maximum sentences of ten years and eight years for aggravated burglary and theft of property over $1,000, respectively. The court also set the fines at $10,000 and $5,000, respectively.

# I

Teal's first challenge is to the sufficiency of the convicting evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App.

1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

Aggravated burglary is committed when "[a] person . . . without the

**10**

effective consent of the property owner: (1) Enters [a habitation] . . . with the intent to commit a felony, theft or assault [or] . . . (3) Enters [a habitation] and commits or attempts to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402 to -403 (1997). Theft of property is committed where "[a] person . . . with the intent to deprive the owner of property . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (1997).

Teal's challenge to the sufficiency of the evidence as to these crimes is primarily an argument of witness credibility. He claims the jury should have rejected the unreliable testimony of Alter in favor of that of Holdaway, Winfred Teal and William Teal, Holdaway having maintained the defendant's innocence and Winfred and William Teal being respected members of the community whose testimony the defendant interprets as exculpatory. As noted above, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being the province of the trier of fact. We decline the defendant's invitation to overturn his convictions by making a different choice than the jury made about whose testimony the jury should have accredited.

Moreover, we find the defendant's convictions to be well-supported by the evidence of record when it is considered in the light most favorable to the state. The defendant was seen driving a truck erratically with the victim's stolen property in the back. The truck matched the description of the truck two neighbors saw leaving the victim's home loaded with the stolen goods. The traffic stop occurred a short time after the neighbors saw the truck leaving the victim's home. It has long been the law in this state that proof of the possession of recently stolen goods, if not satisfactorily explained, gives rise to the inference that the possessor has stolen them, Bush v. State, 541 S.W.2d 391 (Tenn. 1976); State v. Land, 681 S.W.2d

**11**

589, 591 (Tenn. Crim. App. 1984), and has committed the burglary antecedent to the theft. State v. Hamilton, 628 S.W.2d 742, 746 (Tenn. Crim. App. 1981) (citations omitted). In this case, the jury was certainly within its province in rejecting the defendant's evidence that the property was the victim's, not his. The state's evidence also included the fact the defendant behaved nervously when stopped by a sheriff's deputy for a traffic violation, as well as his admission of the burglary and theft to Cindy Alter. A rational jury, as the jury in this case, could have accepted the state's evidence, rather than the defendant's evidence, determined it wove a web of guilt unerringly around the defendant, and found him guilty of aggravated burglary and theft of property beyond a reasonable doubt. Accordingly, the evidence is sufficient to support the convictions.

## II

Next, the defendant contends the trial court erred in imposing maximum sentences and fines for his crimes. In determining whether the trial court has properly sentenced an individual, this court engages in a de novo review of the record with a presumption the trial court's determinations were correct. Tenn. Code Ann. § 40-35-401(d) (1990). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our de novo review, we must consider the evidence at sentencing, the presentence report, the sentencing principles, the arguments of counsel, the statements of the defendant, the nature and characteristics of the offense, any mitigating and enhancement factors, and the defendant's amenability to rehabilitation. Tenn. Code Ann. §§ 40-35-210(b), 40-35-103(5) (1997); Ashby, 823 S.W.2d at 168. On appeal, the appellant has the burden of showing the sentence imposed is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments (1997); Ashby, 823 S.W.2d at 169.

Our review of the record leads us to conclude that the trial court complied with its statutory obligations, and as such, its determination is afforded the presumption of correctness.[5]

The record of the sentencing hearing and the court's order reflect that the court found the presence of both enhancement and mitigating factors. The enhancement factors were

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . .
> (2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors
> . . .
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community
> . . .
> (13)(B) The felony was committed while on . . . [p]arole.

Tenn. Code Ann. § 40-35-113 (1997). The mitigating factors were the defendant's criminal conduct neither caused nor threatened serious bodily injury, the defendant was supporting his family, was a long-time resident of Coffee County, has strong family ties, has a supportive family, and has obtained a G.E.D. while incarcerated. Tenn. Code Ann. § 40-35-114(1), (13) (1997). In addition to the mitigating and enhancement factors, the court announced in its sentencing order but not on the record at the sentencing hearing that one of the "prime considerations" in imposing maximum sentences was "the multitude of daylight burglary offenses which occur in unpopulated areas of Coffee County of which this Court may take judicial knowledge."

The defendant does not challenge the specific enhancement and mitigating factors relied on by the trial court. Rather, he argues the court erred first

---

[5]The defendant has conceded in his brief that our review should be de novo with the presumption of correctness.

in taking sua sponte judicial notice of the daylight burglary problem in Coffee County, and second in imposing a maximum sentence despite a finding of mitigating factors.

In considering the particular crime problem in the county, the court was essentially considering the need for general deterrence within the community. See Tenn. Code Ann. § 40-35-103(1)(B) (1997). The need for general deterrence is not an enhancement factor which may be considered in lengthening a sentence, see Tenn. Code Ann. § 40-35-114 (1997), though it is a factor to be considered in determining whether the defendant should receive alternative sentencing. See Tenn. Code Ann. § 40-35-103(1)(B) (1997); State v. Hartley, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991). In order for the court to consider the need for general deterrence, however, there must be some actual proof supporting it the record. See, e.g., State v. William Mitchell, No. 03C01-9411-CR-00418, slip op. at 5-6 (Tenn. Crim. App., Knoxville, July 24, 1995); State v. Ernest Myers, Jr., No. 03C01-9404-CR-00162, slip op. at 7-8 (Tenn. Crim. App., Knoxville, Feb. 7, 1995), perm. app. denied (Tenn. 1995); State v. David Edward Tiffin, Jr., No. 01C01-9308-CR-00254, slip op. at 6-7 (Tenn. Crim. App., Nashville, May 5, 1994); Hartley, 818 S.W.2d at 375. As such, the court should not have considered this factor in sentencing the defendant.[6]

The questions which remain are whether the defendant's sentence is improper given the trial court's impertinent consideration of general deterrence and the imposition of a maximum sentence in the presence of mitigating factors. We begin our inquiry by noting that, contrary to the defendant's assertion, we do not view the court's statement of the need for general deterrence as reflecting solely on

---

[6]Further, the defendant, a Range II offender, was not presumptively entitled to an alternative sentence. Tenn. Code Ann. § 40-35-102(6) (1997).

the length of the sentence, though we believe the court may have considered deterrence to some extent in determining the defendant should receive a maximum sentence.

As such, the issue becomes whether the length of the defendant's sentence is justified given the enhancement and mitigating factors applicable to him. Contrary to the defendant's argument, he is not entitled to less than a maximum sentence simply because the court found mitigating factors existed. In State v. Boggs, 932 S.W.2d 467 (Tenn. Crim. App.), perm. app. denied (Tenn. 1996), this court held that a maximum sentence may be justified even in the presence of mitigating evidence. There we noted,

> The appellant's sentence is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years. Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.

Boggs, 932 S.W.2d at 475-76 (citations omitted); see State v. Franklin, 919 S.W.2d 362 (Tenn. Crim. App. 1995), perm. app. denied (Tenn. 1996). Thus, the trial court may, in making its sentencing determination, give the mitigating factor(s) only slight weight in comparison with the enhancement factors and arrive at a maximum sentence.

In the case at bar, the record explicitly reflects that the court gave mitigating factor (13) slight weight[7] and implicitly reflects that the court gave mitigating factor (1) little weight in comparison to the great weight given the enhancement factors. As such, this is not a case wherein we may interpose our

---

[7]The facts which fit under factor (13) are that the defendant was supporting his family, was a long-time resident of Coffee County, has strong family ties, has a supportive family, and obtained a G.E.D. while incarcerated. See Tenn. Code Ann. § 40-35-114(13) (1997).

**15**

judgment in place of the trial court's, even if we might prefer a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Although the trial court may have deviated from the statute and considered a non-statutory enhancement factor, we find that the record supports the lower court's sentences, apart from the non-qualifying factor of deterrence,[8] especially in view of the defendant's prior criminal history. Accordingly, we will not disturb the sentences imposed by the trial court.

The final issue is whether the defendant was excessively fined. He urges that the trial court should have waived the fines because he is indigent. He cites no authority in support of his argument, and in support of his indigency he refers us to an order entered several months after the sentencing hearing which finds him indigent for purposes of appointing appellate counsel.[9] Though the defendant has waived the issue by failing to cite authority in his brief, see Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b), we find the issue nevertheless without merit.

In reviewing fines imposed in conjunction with sentencing, we look to "the amount of the fine, the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence." State v. Bryant, 805 S.W.2d 762, 766 (Tenn. 1991). Although the defendant's ability to pay a fine is not necessarily a controlling factor, an oppressive fine can disrupt future rehabilitation and prevent

---

[8]The transcript of the sentencing hearing does not reflect that deterrence was considered by the trial court in setting the sentences. The reference to deterrence appears in a sentencing order subsequently entered by the court and could plausibly be viewed as surplusage.

[9]The record does not reflect an order appointing counsel prior to trial. We therefore presume the defendant did not claim or was not found to be indigent prior to trial and retained his trial counsel through his own means or those available to him.

a defendant from becoming a productive member of society. <u>State v. Marshall</u>, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993). A significant fine is not automatically precluded, however, simply because it works a substantial hardship on the defendant. <u>Marshall</u>, 870 S.W.2d at 542.

In this case, the jury ordered and the court imposed fines of $10,000 for aggravated burglary and $5,000 for theft. Both are the maximum allowed for these offenses. <u>See</u> Tenn. Code Ann. § 40-35-111(b)(3), (4) (1997).

While the defendant may well be indigent, there is no indication he was indigent at the time the court imposed the fines. Further, the record reflects he is physically able to work, although it will be impossible for him to work in a job which will pay "street wages" while he is incarcerated in the Department of Correction. In addition, he has a wife and step-children who rely on him for support. These facts indicate a large fine may impede the defendant's rehabilitation. Further, the defendant has made some effort toward productive living since returning to the Department of Correction by enrolling in self-help classes and competing his G.E.D. On the other hand, the defendant's prospects for rehabilitation are diminished by his history of theft-related convictions and his considerable experience with the law despite his relatively young age of 23 at the time of sentencing.

The case before us presents an extremely close question; however, in view of the presumption of correctness afforded the trial court's judgment, we cannot say the court erred in imposing these fines.

The judgment of the trial court is affirmed.

_____
CURWOOD WITT, JUDGE


CONCUR:


_____
GARY R. WADE, JUDGE


_____
THOMAS T. WOODALL, JUDGE